# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

MARGARET LOUISE SIMPSON, )
                    Plaintiff, )  Case No. 2:16-cv-01074-APG-GWF
)
vs. )  **FINDINGS AND**
)  **RECOMMENDATION**
CAROYN W. COLVIN, Acting Commissioner, )
Social Security Administration, )
)
                    Defendant. )
_____ )

This matter is before the Court on Plaintiff Margaret Simpson's Complaint (ECF No.1), filed on May 13, 2016. The Acting Commissioner filed her Answer (ECF No. 11) on August 15, 2016. Plaintiff filed her Motion for Reversal and/or Remand (ECF No. 15) on September 15, 2016. The Acting Commissioner filed her Cross-Motion to Affirm and Response (ECF No. 25) on January 23, 2017. Plaintiff did not file a reply brief.

## BACKGROUND

**A.    Procedural History.**

Plaintiff filed an application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416, 423, on October 16, 2012, alleging that she became disabled beginning March 22, 2012. Administrative Record ("AR") 58, 159-165. The Commissioner denied Plaintiff's application initially on March 26, 2013, AR 87-91, and upon reconsideration on June 16, 2013. AR 97-101. Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") which was conducted on June 18, 2014 at which Plaintiff appeared and testified. AR 35-57. A vocational expert also testified at the hearing. AR 55-57. The ALJ issued her decision on August 14, 2014 and concluded that Plaintiff was not disabled from March 22, 2012 through the date of the decision. AR 20-28. Plaintiff's request for

review by the Appeals Council was denied on March 9, 2016. AR 1-6. She then commenced this action for judicial review pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned magistrate judge for a report of findings and recommendations pursuant to 28 U.S.C. §§ 636 (b)(1)(B) and (C).

**B.     Factual Background.**

Plaintiff Margaret Simpson was born on April 13, 1956 and was 58 years old at the time of the hearing before the ALJ. She completed two years of college and has an associate of arts degree. AR 39. Plaintiff is 5'3" tall and has weighed in the range of 200 to 220 pounds during the past several years. AR 40, 427. She was employed by SOC LLC, a contractor at the Hawthorne Army Depot in Hawthorne, Nevada, from January 1994 until March 2012. Her job duties included typing damage and transit reports, issuing ammunition to troops and keeping track of ammunition that was moved or destroyed. In this job, Plaintiff walked 2 hours, stood 2 hours, and sat 6 hours a day. She did not carry anything heavy. "The only thing she would carry is a box full of paper to the printer." The heaviest weight she lifted and carried was 10 pounds which she did frequently. AR 193-194.

Plaintiff's medical records show that she suffers from asthma and has diabetes mellitus.[1] She received psychotherapy counseling for depression and anxiety relating to work, family members, personal relationships, and her poor financial condition after she stopped working and her unsuccessful efforts to obtain jobs. Plaintiff had regular sessions with one psychologist from January 2010 through December 20, 2013. AR 416-534. She saw a second psychologist between January 17 and June 6, 2014. AR 454-460. Neither psychologist prepared a mental residual functional capacity assessment.

Plaintiff underwent cervical spine fusion surgery in December 2005. AR 427. On June 8, 2010, she fell out of her chair at work, injuring her neck, back, buttocks and right knee. Her neck, back and buttocks symptoms resolved fairly quickly, but her right knee continued to bother her. *Id.* On March 16, 2012, she reported to physician assistant ("PA")William Leaming that she had persistent knee pain for the past three weeks which was moderate to severe. AR 314. On April 27, 2012, she told PA Leaming

---

[1] Because Plaintiff's asthma and diabetes are not pertinent to the issue raised in Plaintiff's motion to remand, they are not discussed in detail here.

2

that she was "falling a lot." He noted bilateral, mild knee joint effusion and tenderness. AR 310. On June 12, 2012, Plaintiff reported to PA Laura Millsap that she injured her right knee when she was getting into a truck. Her knee gave out on her and she fell to the ground. She felt like she twisted the knee. AR 302. An MRI of the right knee was performed on June 15, 2012 which revealed (1) "[s]evere tricompartmental osteoarthritis of the knee with extensive cartilage loss in all three compartments," (2) "[m]acerated-type full thickness tear of the posterior horn of the medial meniscus with secondary peripheral extrusion of the body," (3) "[t]hickened and abnormal appearing anterior cruciate ligaments with abnormal signal," and (4) "[l]arge suprapatellar joint effusion with mild synovids." AR 234. On June 24, 2012, Plaintiff reported to Dr. Daniel Dees that her right knee had given out that day while she was walking with her cane and that she fell to the ground twisting her right knee. She stated that her knee had given out occasionally in the past, but she did not fall or injure herself until that day. She was unable to straighten the knee for a period of time after the fall and had spasms in the leg. By the time she saw the doctor, she had pain, tenderness and swelling about the right knee. AR 298.

On August 20, 2012, Plaintiff saw Dr. Galen Reimer, a family practice physician. She reported the onset of knee pain "1 year ago" and her pain level was 8. The pain was constant and stable. AR 265. Dr. Reimer referred her to an orthopedic surgeon for evaluation. *Id.* Plaintiff was seen by Dr. Jeffrey Webster, an orthopedic surgeon, on September 12, 2012. She reported that her knee pain level was 9 and that the pain occurred constantly and was worsening. AR 226. Dr. Webster performed an injection to the knee. AR 228-29. He indicated that Plaintiff should return as necessary, that she would benefit from weight loss, and that surgery was not indicated at that time. AR 226. Plaintiff returned to Dr. Reimer on November 14, 2012 with continued complaints of right knee pain, which she now described as a 10 in severity. Dr. Reimer reviewed the orthopedic surgeon's consultation note and stated that Plaintiff may require total knee replacement in the future. He prescribed pain medication for her symptoms. AR 261. On November 28, 2012, Dr. Reimer further noted that Plaintiff had severe bilateral knee arthritis and internal damage; that her orthopedic surgeon had recommended knee replacement surgery in the near future and that she used a cane or walker for ambulation. AR 257. Dr. Reimer saw Plaintiff on April 25, 2013 at which time her pain level was a constant 5. Dr. Reimer noted that she had failed steroid injection therapy and probably needed knee replacement surgery. AR 250.

Dr. Sheri J. Hixon-Brenenstall performed a psychological evaluation of Plaintiff on March 20, 2013 at the request of the Bureau of Disability Adjudication. AR 236-241. She noted under general observations that Plaintiff's emotional expression and affect were within the normal and reactive range of functioning. AR 236. Plaintiff's primary psychiatric history and complaint was depression. AR 237. Her cognitive presentation on mental status evaluation supported average intellectual functioning. Her social skills were within the average range. Dr. Hixon-Brenenstall stated that "[w]hat was observed clinically, was a woman who experiences mild emotional difficulty coping with the reported chronic medical symptoms and conditions. . . . Despite the mild emotional difficulty, her cognitive and social skills are within the average range of functioning." AR 237.

Under "Mood and Affect," Dr. Hixon-Brenenstall noted that Plaintiff reported a stable mood rating of 5.10 (10 = severe). She consciously worked toward feeling happy and calm. She sometimes felt tearful, and upset and frustrated with her chronic medical problems and physical limitations which she felt had a negative influence on her mood. AR 238. Mood fluctuations were not observed during the interview. Plaintiff's attention and concentration abilities were within the average range of functioning. Her judgment was satisfactory. *Id.* Dr. Hixon-Brenenstall opined that Plaintiff was capable of (A) carrying out detailed and complicated instructions; (B) carrying out simple instructions consistently over time without difficulty; (C) her attention and concentration ability were sufficient to carry out both detailed and complicated tasks, and simple tasks consistently; and (D) her social skills were sufficient to engage in appropriate interactions with supervisors, coworkers, and the public as one would expect within typical employment contexts. AR 240-241. Dr. Hixon-Brenenstall's diagnosis was: Axis I: Mood Disorder due to a General Medical Condition, with Depressive Features; Anxiety Disorder due to a General Medical Condition  Axis II: No diagnosis; Axis III: Pain Disorder Associated with a General Medical Condition; Axis IV: Financial Under-Employed; and Axis V: Psychological Only Current GAF = 68-72. AR 241.

Plaintiff was seen by PA Leaming on June 11, 2013 with complaints of a "depressed mood." She reported that increasing symptoms began about three months ago. She did not feel like getting out of bed and was increasingly tearful. Situational stress-work was indicated, along with the fact that Plaintiff's cat died. AR 355. PA Leaming diagnosed "endogenous depression, unspecified" and

prescribed Paxil. *Id.* He saw her again on June 25, 2013. Plaintiff denied worsening symptoms. PA Leaming continued her on Paxil. AR 353. On August 15, 2013, Plaintiff stated that she started on Paxil two weeks ago. She had not started earlier due to lack of insurance. She reported some improvement in symptoms and was continued on the medication. AR 351. On September 26, 2013, Plaintiff indicated that she was "doing well." She felt depressed two weeks prior due to financial issues. Overall, she felt that the change to Paxil CR had helped. She was continued on the medication. AR 349. Plaintiff had an appointment scheduled for December 26, 2013, but it is unclear whether she kept it. AR 348. She was subsequently seen by PA Leaming on February 18, 2014, by PA Millsap on April 21, 2014, and then by PA Leaming on May 29, 2014. There is no mention of depression in these progress notes. Nor was it listed as a diagnosis. AR 342-346, 555-556.

On April 21, 2014, PA Millsap noted that Plaintiff had chronic bilateral knee pain/arthritis. Plaintiff reported feeling well and denied any specific complaints. AR 344. On physical examination, the right knee was tender over the patella, with crepitation with movement. Plaintiff had limited range of movement and could not fully extend. AR 345. Plaintiff was seen by PA Leaming on May 29, 2014. She wanted a referral with respect to her knee pain. PA Leaming noted that Plaintiff's right knee pain had been ongoing since September 2011. The pain was progressive and severe; and was aching, sharp, and fairly constant. It was aggravated by walking and standing, and partly relieved by medication. AR 342. An MRI of the right knee was obtained on May 30, 2014 which showed findings substantially similar to those in the prior MRI in June 2012. AR 360.

On June 17, 2014, one day prior to the hearing before the ALJ, an "Arthritis Questionnaire" was signed by "Juanchichos Ventura for William Leaming." AR 213-216. The questionnaire responses stated that Plaintiff had constant stabbing pain which was made worse by cold, standing too long and sitting too long. Her pain level was 8 ½ on a scale of 10. The pain seldom interfered with Plaintiff's attention and concentration. She was able to tolerate moderate work stress. Norco medication caused dizziness. Plaintiff was not able to walk a whole city block. She could continuously sit or stand for a maximum of 45 minutes. She could sit about 4 hours and stand/walk for about 2 hours during an 8-hour work day with normal breaks. AR 214. Plaintiff would need to take 2 or 3 unscheduled breaks of 5 to 10 minutes during an 8-hour working day. She was required to use a cane or assistive device when

standing or walking.  She could occasionally lift up to 20 pounds so long as she used a cane.  She could bend or twist 90 percent with a cane, but only 50 percent without a cane.  AR 215.  She could frequently twist, stoop (bend) and climb stairs with the use of a cane.  She could only occasionally twist or stoop without a cane, and could climb stairs with a cane.  She could not crouch or climb ladders.  The questionnaire responses stated that Plaintiff should avoid exposure to extreme cold, heat and humidity.  She did not have to avoid exposure to odors, dust, gases, perfumes, cigarette smoke, solvents, cleaners or chemicals.   Plaintiff was likely to have good days and bad days, and would likely be absent from work about twice a month.  AR 216.

Plaintiff was seen by Dr. Martin Anderson, an orthopedic surgeon, on September 4, 2014 pursuant to a referral by PA Leaming.  Dr. Anderson noted that Plaintiff had a history of chronic knee symptoms and a long history of bone-on-bone osteoarthritis.  He also noted that "[s]he was previously denied surgery in Fallon because her surgeon felt that she was too heavy.  She has tried to loose (sic) weight without success."  AR 551.  Cortizone injections provided only temporary relief.  She currently managed her pain with Norco and Ibuprofen medications.  Plaintiff reported that she was beginning to have some left sided knee symptoms.  "Symptoms are now significant enough that she is beginning to take fall with episodes of locking and buckling."  *Id.*  Plaintiff described her knee symptoms as burning, catching, swelling, stiffness, giving out, popping, and locking.  The pain was relieved by medication, ice, elevation and massage.  It was worsened by sleeping, weather, using it, standing for long periods of time, walking, driving, moving, and sitting for long periods of time.  AR 551-552.

On physical examination, Dr. Anderson found some reproduction of pain with resisted straight leg raise on the right and limited external rotation with pain at the endpoint at 35 degrees.  Internal rotation was 15 degrees without any significant discomfort.  Knee motion was 0 to 115 degrees.  There were mild varus deformities and medial joint line tenderness bilaterally.  The knees were ligamentously intact.  AR 553.  Dr. Anderson noted that four views of the knee demonstrated bone-on-bone osteoarthritis with large osteophytes.  His impression was osteoarthritis of both knees, symptomatic on the right and refractory to nonoperative care.  Dr. Anderson discussed knee replacement surgery with Plaintiff and stated that she would contact his office if she desired to schedule surgery.  He stated that "[s]he is fairly incapacitated at this point and has been unable to secure disability and she currently

works six hours one day a week at a library." AR 554.

Plaintiff stated in her application for disability benefits that she became unable to work as of March 22, 2012 because of her disability. AR 159. She told her psychotherapist on April 4, 2012, however, that she was fired from her job "2 weeks ago." AR 498. On April 20, 2012, she reported that she was depressed about losing her job and also about frequent falling due to balance and her knees giving out. AR 497. On May 4, 2012, Plaintiff discussed looking for a good job anywhere in the country. AR 496. In subsequent counseling sessions, she discussed looking for a job and the job applications she had submitted. AR 484, 490. Plaintiff testified at the hearing that she obtained a part-time job in January 2013 as a circulating librarian at the Hawthorne public library. She worked 6 to 12 hours a week. AR 40. She told her therapist on January 13, 2013 that she hoped this job would be a foot in the door for county positions. AR 483. After obtaining the library job, Plaintiff continued to discuss her desire to find employment in a larger city so that she could move away from Hawthorne. AR 473. As of the end of 2013, however, her applications for employment elsewhere were unsuccessful. AR 461-463, 466, 470.

On December 22, 2012, the Social Security Administration medical consultant Dr. David Braverman prepared a residual functional capacity assessment based on a review of the records. He stated that in an eight hour work day, Plaintiff could occasionally lift and carry 50 pounds; could frequently lift and carry 25 pounds; could stand and/or walk for a total of 4 hours; could sit with normal breaks for 6 hours; and had unlimited ability to push or pull other than as shown for lift and/or carry. Dr. Braverman also stated that Plaintiff could occasionally climb ramps and stairs; could never climb ladders, ropes and scaffolds; and could occasionally balance, stoop or bend at the waist, kneel, crouch and crawl. She had no environmental limitations to extreme cold or heat, humidity, or vibrations, but should avoid concentrated exposure to wetness, fumes, odors, dusts, gases, poor ventilation and hazards such as machinery or heights. AR 65-67. Another medical consultant, Dr. William McCollum, prepared a residual functional capacity assessment on July 15, 2013. He stated that Plaintiff could occasionally lift and carry 25 pounds and could frequently lift 20 pounds. She could stand and/or walk 2 hours and could sit about 6 hours in a 8 hour day with normal breaks. She had unlimited ability to push and pull other than as shown for lift and/or carry. Plaintiff could occasionally climb ramps and stairs, balance,

stoop, kneel, crouch, and crawl. She should avoid concentrated exposure to extreme cold and wetness, fumes, odors, dust, gases, or poor ventilation. She did not have limitations with regard to humidity, noise, or vibration. AR 79-80.

Plaintiff testified at the June 18, 2014 hearing that she lived alone in a house. She did her own cooking, cleaning and shopping, and took care of her personal needs. She also drove an automobile. For relaxation, she mostly read. She attended church. She also had three dogs. AR 44-45. Plaintiff described her hobbies as reading, singing for church and crocheting. She testified that she previously visited her mother who resided in Sacramento, but had not done so in a year and a half. AR 45. Plaintiff testified that she could walk so long as she had a cane. She needed a cane because of her poor balance and her knees. "I've tried walking without the cane, and I wobble very badly, and then, too, my knees act like they just want to give out. So the cane does help." AR 47. She could sit for about 20 to 30 minutes, but then had to get up because her knees start hurting. She could stand for about 30-45 minutes before her knees started hurting. She alternated between sitting and standing in her librarian job. AR 47. She could lift 10 pounds so long as she used her cane. The ALJ asked Plaintiff why she could not work. She testified that "[r]ight now . . . I'd just have to take some breaks to get up, and move around besides just sitting still for so many hours, and then I'd have to take a break. That would, you know, just so I can move around, get my knees back moving again." AR 48. She testified that in her librarian job she would stand or sit. She helped people with questions, shelved books, magazines, and newspapers. She did not do any heavy lifting. AR 53. Plaintiff also testified that she received treatment for depression, but did not have difficulty being around or interacting with people. Nor did she have any difficulty concentrating or focusing on tasks, or watching television. AR 50. Medication helped control her depression. AR 51.

The vocational expert testified that Plaintiff's past relevant work was an "inventory control clerk," DOT 219.387-030, which is classified as light work, but was sedentary work as performed by Plaintiff. AR 53-54. The ALJ asked the vocational expert to assume an individual of the same age, education and past work experience as Plaintiff. The individual would be limited to lifting 20-25 pounds; could stand and/or walk for two hours, and sit for six hours in an eight hour day and would therefore be limited to occasional posturals. The individual would have to avoid fumes, dusts, or

chemicals, and anything of an intoxicating nature. The individual had no mental limitations. AR 54. The vocational expert testified that the hypothetical individual could perform Plaintiff's past work. AR 54. The individual would also be able to perform the alternative jobs of routing clerk, DOT 222.687-022, and investigator dealer accounts, DOT 241.367-038, both of which are light exertional level jobs. AR 55. Under examination by Plaintiff's counsel, the vocational expert testified that she would not be able to perform any work if she was required to be absent from work one to two times per week. AR 56.

### C. Administrative Law Judge's August 14, 2014 Decision.

The ALJ applied the five-step sequential evaluation process established by the Social Security Administration in determining whether Plaintiff was disabled. AR 22-28. The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2017. She had not engaged in substantial gainful activity since her alleged onset date of March 22, 2012. Her earnings from part-time work were not sufficient to be considered substantial gainful activity. AR 22.

At step two, the ALJ found that Plaintiff had the following severe impairments: degenerative joint disease of the knees, obesity, diabetes mellitus II, and asthma. (20 CFR 404.1520(c)). The ALJ evaluated Plaintiff's mental impairment of depression under the "paragraph B" criteria in section 12.00C of the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1) and found that it caused no more than "mild" limitations in any of the first three functional areas and that Plaintiff had no episodes of decompensation of extended duration in the fourth area. AR 23. Her mental impairment was therefore not severe. The ALJ also found that Plaintiff's hypertension, gastroesophageal reflux disorder and status post cervical fusion surgery did not cause more than minimal limitation on work activities or activities of daily living and were therefore not severe. AR 22. At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526). AR 23.

Prior to step four, the ALJ found that Plaintiff had the residual functional capacity to perform less than the full range of light work as defined in 20 CFR 404.1567(b). The ALJ stated that Plaintiff was able to lift and/or carry 25 pounds occasionally and 20 pounds frequently. She could sit for 6 hours in an 8 hour work day. She was able to stand and/or walk 2 hours in an 8 hour work day. Plaintiff was

9

required to avoid exposure to fumes dust, chemicals, and other pulmonary irritants. She was able to sustain simple tasks, detailed and complex tasks, and was able to relate appropriately to coworkers and supervisors. AR 24.

In regard to Plaintiff's right knee condition, the ALJ noted that Dr. Reimer stated that her orthopedic problems greatly limited her ability to ambulate and perform activities of daily living, and that she could not ambulate without an assistive device. Dr. Reimer also stated that Plaintiff would need knee replacement surgery soon, but he "did not offer a residual functional capacity assessment." AR 26. The ALJ gave little weight to the opinion of Dr. Braverman, who stated that Plaintiff could perform a restricted level of medium work, because "claimant's knee condition requires greater restriction in light of the severity of the full thickness loss of weight-bearing cartilage." AR 26. The ALJ noted that "[n]one of the treating sources has discussed the claimant's residual functional capacity." AR 27. She found that Dr. McCollum's opinion was consistent with the longitudinal record as whole, and that limiting Plaintiff to approximately two hours of standing and/or walking during an eight-hour workday was consistent with the claimant's knee condition. She also stated that a limitation of two hours on her feet during a workday was consistent with the significant degeneration shown on objective studies such as the MRIs of the right knee. *Id.* The ALJ also stated that Dr. McCollum's opinion was consistent with Plaintiff's activities. She therefore gave Dr. McCollum's opinion great weight. *Id.*

Based on Plaintiff's residual functional capacity, the ALJ found at step four that she could perform her past work as a "stock clerk, 219.387-030." AR 27. She compared Plaintiff's residual functional capacity with the physical and mental demands of this work, and found that she was able to perform it as actually performed. The ALJ therefore concluded that Plaintiff was not disabled from March 22, 2012 through the date of her decision. AR 28.

## DISCUSSION

### I. Standard of Review

A federal court's review of an ALJ's decision is limited to determining only (1) whether the ALJ's findings were supported by substantial evidence and (2) whether the ALJ applied the proper legal standards. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *Delorme v. Sullivan,* 924 F.2d 841, 846 (9th Cir. 1991). The Ninth Circuit has defined substantial evidence as "more than a mere scintilla

but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Woish v. Apfel*, 2000 WL 1175584 (N.D. Cal. 2000) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)); *see also Lewis v. Apfel*, 236 F.3d 503 (9th Cir. 2001). The Court must look to the record as a whole and consider both adverse and supporting evidence. *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993). Where the factual findings of the Commissioner of Social Security are supported by substantial evidence, the District Court must accept them as conclusive. 42 U.S.C. § 405(g). Hence, where the evidence may be open to more than one rational interpretation, the Court is required to uphold the decision. *Moore v. Apfel*, 216 F.3d 864, 871 (9th Cir. 2000) (*quoting Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984)). *See also Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). The court may not substitute its judgment for that of the ALJ if the evidence can reasonably support reversal or affirmation of the ALJ's decision. *Flaten v. Sec'y of Health and Human Serv.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

It is incumbent on the ALJ to make specific findings so that the court need not speculate as to the findings. *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981), citing *Baerga v. Richardson*, 500 F.2d 309 (3rd Cir. 1974). In order to enable the court to properly determine whether the Commissioner's decision is supported by substantial evidence, the ALJ's findings "should be as comprehensive and analytical as feasible and, where appropriate, should include a statement of subordinate factual foundations on which the ultimate factual conclusions are based." *Lewin*, 654 F.2d at 635.

In reviewing the administrative decision, the District Court has the power to enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). In the alternative, the District Court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." *Id.*

**II.     Disability Evaluation Process**

To qualify for disability benefits under the Social Security Act, a claimant must show (a) that she suffers from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less that twelve months;

11

and (b) that the impairment renders her incapable of performing the work that she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999); *see also* 42 U.S.C. § 423(d)(2)(A). The claimant has the initial burden of proving disability. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir 1995), *cert. denied*, 517 U.S. 1122 (1996). If the claimant establishes an inability to perform her prior work, the burden shifts to the Commissioner to show that the claimant can perform a significant number of other jobs that exist in the national economy. *Hoopai v. Astrue*, 499 F.3d 1071, 1074-75 (9th Cir. 2007). Social Security disability claims are evaluated under a five-step sequential evaluation procedure. *See* 20 C.F.R. § 404.1520(a)-(f). *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001). The claimant carries the burden with respect to steps one through four. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). The sequential evaluation process is accurately set forth in the ALJ's decision, AR 20-22, and will not be repeated here.

### III. Whether the ALJ Erred in Failing to Consider the Residual Functional Capacity Assessment Allegedly Performed by Physician Assistant William Leaming.

Plaintiff argues that the ALJ erred by failing to consider PA Leaming's June 17, 2014 opinion regarding her residual functional capacity. *Motion* (ECF No. 16), at pgs 7-11. According to the Arthritis Questionnaire, Plaintiff had significant limitations on her ability to stand, walk and sit. In particular, Plaintiff was limited to standing and/or walking for about two hours and was limited to sitting for about four hours during an 8-hour workday. AR 214. The questionnaire also states that Plaintiff would need to sometimes take unscheduled breaks of 5-10 minutes, 2 or 3 times in a workday, and she would be absent from work due to her impairments about once or twice a month. AR 215-216. Plaintiff argues that "[t]here can be no reasonable dispute that Mr. Leaming's assessment establishes far greater and detailed limitations which were not included in the ALJ's RFC finding. In addition to limits on the amount of time Ms. Simpson could stand, walk, and sit at one time, her need for an assistive device (which, *at minimum*, would limit her ability to handle objects with both hands while standing/walking, since one hand would always be occupied with holding her cane); moreover, the limitation to only moderately stressful work stands in sharp contrast to the ALJ's RFC which included no mental limitations whatsoever." *Motion* (ECF No. 16), at pg. 6. The Commissioner argues that the ALJ did not

12

err by failing to consider the Arthritis Questionnaire. She states that "[s]omeone named Juanchichos Ventura completed the form (AR 215) and the record contains no indication regarding who that person is, much less whether the person has any medical qualifications. . . . " *Cross-Motion* (ECF No. 25), at pg 4. "Thus, not only is Mr. Leaming himself not an acceptable medical source capable of diagnosing impairments and assessing limitations, but he did not complete – or even sign – the form Plaintiff bases her entire argument upon." *Id.*

Section 223(d)(5)(B) of the Social Security Act, 42 U.S.C. § 423(d)(5)(B), states that in making a determination regarding disability, the Commissioner shall consider all evidence available in the case record. Social Security Ruling (SSR) 06-03p states that in accordance with Section 223(d)(5)(B), the evidence to be considered "includes, but is not limited to, objective medical evidence; other evidence from medical sources, including their opinions; statements by the individual and others about the impairment(s) and how it affects the individual's functioning. . . ." 2006 WL 2329938, at *1.[2]

The regulations state that medical opinions are statements from "acceptable medical sources" that reflect judgments about the nature and severity of the claimant's impairments, including symptoms, diagnosis and prognosis, and what the claimant can still do despite her impairments and physical or mental restrictions. 20 CFR § 404.1527(a)(1). More weight is generally given to the medical opinion of a treating physician than to the opinion of an examining or reviewing physician; and more weight is given to an examining physician's opinion than to that of a reviewing physician. 20 CFR § 404.1527(c)(1) and (2). *See also Ghanim v. Colvin*, 763 F.3d 1154, 1160 (9th Cir. 2014); *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001). "Acceptable medical sources" include licensed physicians or osteopathic doctors; and licensed or certified psychologists. SSR 06-03p, at *1. Medical sources who are not "acceptable medical sources" include nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists. *Id.* at *2.

SSR 06-3p notes that the regulations, 20 CFR §§ 404.1527(c) and 416.927, provide specific criteria for evaluating medical opinions from "acceptable medical sources," but do not address how to consider opinions and other evidence from "other sources." Medical sources, who are not "acceptable

---

[2] SSR 06-03p was repealed effective March 27, 2017.

13

medical sources," have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources are therefore important and "should be evaluated on key issues such as impairment severity and functional effects, along with other relevant evidence in the file." *Id.* at *3. The ruling indicates that medical opinions from "acceptable medical sources" are accorded greater weight because "acceptable medical sources" are the most qualified health care professionals:

> However, depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an "acceptable medical source" may outweigh the opinion of an "acceptable medical source," including the medical opinion of a treating source. For example, it may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion. Giving more weight to the opinion from a medical source who is not an "acceptable medical source" than to the opinion from a treating source does not conflict with the treating source rules in 20 CFR 404.1527(d)(2) and 416.927(d)(2) and SSR 96-2p.

*Id.* at *5.

The ALJ stated that Plaintiff's "primary treating source is a physician's assistant named Leaming." AR 24. She discussed PA Leaming's examination/treatment notes including the fact that Plaintiff received a referral (from PA Leaming) on May 29, 2014 to see an orthopedic surgeon about her knees. AR 25. The ALJ, however, did not mention the Arthritis Questionnaire in her decision and there is no reason to believe she considered it. Rather, the decision indicates that she simply overlooked it. In this regard, the ALJ stated that "[n]one of the treating sources have discussed the claimant's residual functional capacity." AR 27. It is unlikely that she would have made this statement if she was aware of the Arthritis Questionnaire.

The Arthritis Questionnaire was signed by "Juanchichos Ventura for William Leaming." This suggests that the questionnaire responses were provided by PA Leaming, but that the document was signed for him by Mr. Ventura— perhaps because PA Leaming was unavailable. The fact that PA Leaming had recently seen and evaluated Plaintiff with respect to her ongoing knee symptoms supports the conclusion that he was the author of the responses in the questionnaire. The Commissioner has not provided any authority that a medical record signed on behalf of a physician or other medical source by

14

an assistant is invalid and should be completely disregarded. This may, however, be a fact that the ALJ can consider in determining the weight that should be accorded to the opinion.

The Arthritis Questionnaire is the type of non-acceptable medical source opinion that should be considered and potentially accepted by the ALJ. The degenerative conditions in Plaintiff's right knee were objectively documented in the 2012 and 2014 MRI studies. These conditions were also diagnosed and evaluated by at least four licensed physicians ("acceptable medical sources") — Dr. Daniel Dees, AR 298, Dr. Galen Reimer, AR 265, Dr. Jeffery Webster, an orthopedic surgeon, AR 226, and Dr. Martin Anderson, an orthopedic surgeon. AR 551. None of these physicians, however, provided an assessment of Plaintiff's residual functional capacity. In comparison to these physicians, PA Leaming saw and examined Plaintiff with respect to her knee condition on a more frequent basis. He was arguably in a better position than other medical sources to determine the extent to which her knee problems limited her ability to stand, walk or sit for extended periods of time.

The opinions of Dr. Braverman and Dr. McCollum, are contrary to the Arthritis Questionnaire. Neither of these physicians examined Plaintiff, however. Dr. Braverman rendered his assessment on December 22, 2012 and Dr. McCollum rendered his assessment on July 15, 2013. Plaintiff's knee symptoms appear to have been progressively worsening. It also does not appear that either Dr. Braverman and Dr. McCollum had the opportunity to review the records from the Mount Grant Medical Clinic which predated their assessments. These records were submitted by Plaintiff's counsel at the June 18, 2014 hearing. AR 36-38. Thus, Plaintiff's residual functional capacity with reference to her right knee reasonably could have been different and more limited on June 17, 2014 from what it was in December 2012 or July 2013.[3]

PA Leaming's residual functional capacity assessment, if accepted, would support a finding that

---

[3] This does not mean that on remand the ALJ must accept PA Leaming's residual functional assessment. The record indicates that Plaintiff was able to perform a variety of household tasks and other activities of daily living that are arguably inconsistent with PA Leaming's RFC assessment. She also worked 1 or 1 ½ days a week as a librarian which involved work activities similar to her prior work position. The part-time work may have had more to do with her inability to find a full-time job than with the inability to perform full-time work. The evidence indicates that after Plaintiff was terminated from her job at the Hawthorne Army Depot, she continued to seek other full-time employment before and after she obtained the job as a librarian.

15

Plaintiff was unable to perform sedentary or light work. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job primarily involves sitting, a certain amount of walking and standing is often necessary to carry out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 CFR § 404.1567(a). "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 CFR § 404.1567(b).

"Occasionally" means occurring from very little up to one third of the time. "Since being on one's feet is required 'occasionally' at the sedentary level of exertion, periods of standing or walking should generally total no more than about two hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251, at *5. SSR 83-12 further states:

> In some disability claims, the medical facts lead to an assessment of RFC which is compatible with the performance of either sedentary or light work except that the person must alternate periods of sitting and standing. The individual may be able to sit for a time, but must then get up and stand or walk for awhile before returning to sitting. Such an individual is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work (and for the relatively few light jobs which are performed primarily in a seated position) or the prolonged standing or walking contemplated for most light work. (Persons who can adjust to any need to vary sitting and standing by doing so at breaks, lunch periods, etc. would still be able to perform a defined range of work.)
>
> There are some jobs in the national economy – typically professional and managerial ones – in which a person can sit or stand with a degree of choice. If an individual had such a job and is still capable of performing it or is capable of transferring work skills to such jobs, he or she would not be found disabled. However, most jobs have ongoing work processes which demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task. Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will. In cases of unusual limitation of ability to sit and stand, a VS should be consulted to clarify the implications for the occupational base.

1983 WL 31253, at *4.

. . .

Here, PA Leaming's RFC assessment limited Plaintiff to sitting for approximately four hours in an 8-hour workday, which is less than that generally required for sedentary work. Thus, if that assessment was accepted, a finding of disabled could be required.

Plaintiff argues that PA Leaming's statement that she could tolerate "moderate stress" is contrary to the ALJ's determination that her mental impairments did not limit her ability to work. This argument lacks merit. The Arthritis Questionnaire does not define "moderate stress." Dr. Hixon-Brenenstall found that Plaintiff suffered from mild depression, and that she had the ability to carry out both simple and detailed and complicated instructions, and had social skills sufficient to engage in appropriate interactions with supervisors, coworkers and the public in typical employment contexts. Plaintiff's own testimony regarding her mental condition is consistent with this assessment. Thus, even if the ALJ had considered the Arthritis Questionnaire, it would not have reasonably altered her assessment of the impact that Plaintiff's mental impairment had on her ability to work.

## CONCLUSION

The record supports the conclusion that PA Leaming's June 17, 2014 assessment was overlooked by the ALJ and was therefore not considered by her in determining Plaintiff's physical residual functional capacity. Because PA Leaming's opinion, if accepted, supports a finding that Plaintiff is not capable of performing light or sedentary work, this matter should be remanded for further hearing and determination. Accordingly,

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Reversal and/or Remand (ECF No. 15) be **granted;** that the Acting Commissioner's Cross-Motion to Affirm (ECF No. 25) be **denied**; and that this matter be remanded to the Social Security Administration for further hearing and determination regarding Plaintiff's residual functional capacity and ability to perform light or sedentary work.

## NOTICE

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days. The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections

within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 12th day of December, 2017.

_____
GEORGE FOLEY, JR.
United States Magistrate Judge